799 So.2d 226 (2001)
Tina M. TETRAULT and Arthur T. Tetrault, Appellants,
v.
James A. FAIRCHILD, Appellee.
Nos. 5D00-1336, 5D00-1641.
District Court of Appeal of Florida, Fifth District.
July 24, 2001.
Rehearing Denied November 13, 2001.
Richard A. Sherman and Rosemary B. Wilder, of Law Office of Richard A. Sherman, P.A., Fort Lauderdale, and Theresa K. Clark, of Law Office of Patricia E. Garagozlo, Melbourne, for Appellants.
James I. Knudson and Jerry D. McGreal of Knudson & McGreal, P.A., Rockledge, and Edna L. Caruso, of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, for Appellee.
PER CURIAM.
Tina Tetrault, while driving a vehicle owned by herself and her husband, collided with a vehicle driven by James Fairchild, causing him injury. Fairchild sued and prevailed. We reverse.
*227 Dr. Gordon was the radiologist assigned to the emergency room that received the plaintiff on November 13, 1996. While being evaluated in the emergency room, x-rays were ordered and these were examined on the day of the accident by Dr. Gordon, who wrote a report opining that these x-rays reflected no visible injury. That was the extent of his involvement with the plaintiff. Plaintiff was given Darvaset and Valium for pain in the emergency room and released.
Plaintiff subsequently began treatment with Dr. Seconi, a chiropractor. Dr. Seconi referred the plaintiff to Dr. Prusinski, a neurologist, who performed a 1996 MRI and whose report reflected only "bulging discs." The plaintiff continued treatment with Dr. Seconi through the end of 1997. In October 1999, the plaintiff began to experience increased pain and began to treat with an orthopaedic surgeon, Dr. Hanna. Dr. Hanna ordered a new MRI, which was performed in October 1999. The radiologist, Dr. Shapiro, found "No significant interval change" since the 1996 MRI and diagnosed a "bulging disc with a tear in the posterior annular fibers."
Approximately three months before the second MRI was taken, the trial court entered its order setting various trial preparation cut-off dates and scheduling the trial for January 24, 2000. Disclosure of expert witnesses was required by October 15, 1999, and discovery was to be completed by January 10. The defendant took an up-dated deposition of the plaintiff on November 29 and, at that time, learned of the plaintiff's recent and on-going treatment with Dr. Hanna and Dr. Shapiro. Previously, on September 21, 1999, the plaintiff responded to expert interrogatories identifying the various physicians and experts expected to testify. Rather than answer the interrogatories as posed, the restated answers created aggregate responses. The only one appearing to apply remotely to Dr. Gordon is the following:

Doctors shall testify to their care and treatment of Plaintiff. Dr. Prusinski, Dr. Seconi, and Dr. Fornus will also testify that plaintiff has sustained a permanent impairment as a result of the injuries sustained in the incident which is the subject matter of this lawsuit. They shall also testify as to the causation of the injuries for which they treated plaintiff. Further, they will testify as to diagnosis, prognosis and necessity for further follow-up care. [Emphasis supplied.]
The defendant appeals the court's refusal to allow the defense a continuance in order to obtain a neuroradiologist to evaluate the 1996 and 1999 MRIs and critique the opinions of the current treating physicians concerning the plaintiff's condition.
The testimony of Dr. Gordon was critical to plaintiff's case. Shortly before the trial, Dr. Gordon was contacted by plaintiff's counsel, was given the 1996 and 1999 MRIs and was asked to give an opinion concerning the injury they depicted. From the date of the plaintiff's accident until trial, Dr. Gordon was indicated as nothing more than the post-accident emergency room x-ray-reading radiologist who had written a report reporting no injury. Nothing in the answers to expert interrogatories and nothing learned by the defendant through the taking of the plaintiff's deposition could have reasonably put the defense on notice that Dr. Gordon would be called to testify as an expert radiologist to give his evaluation of the two subsequent MRIs and render opinions based on them that the plaintiff had suffered a herniated disc caused by the accident.
The plaintiff urges that the reference in the answer to expert interrogatories that Dr. Gordon would testify as to *228 "causation" was sufficient because "certainly causation encompasses interpreting the MRIs." It is disappointing to see counsel make such an argument. The only other argument to be made is that the expert testimony of Dr. Gordon was harmless because it was "merely cumulative" to Dr. Shapiro's report. While the erroneous omission of cumulative evidence can be harmless, "harmless error" is a more difficult case to make when the testimony is not that of a fact witness, but instead is expert testimony. Dr. Gordon was called by the plaintiff not to testify to his "care and treatment" of plaintiff but to render an opinion as a neuroradiologist based upon his review of MRIs supplied to him in plaintiff's counsel's office as to whether MRIs showed a herniated disc. It was reversible error to allow Dr. Gordon to offer expert testimony based on the October 1996 and October 1999 MRIs. See Suarez-Burgos v. Morhaim, 745 So.2d 368 (Fla. 4th DCA 1999), rev. denied, 767 So.2d 461 (Fla.2000).
REVERSED and REMANDED for a new trial.
GRIFFIN, J., concurs.
HARRIS, J., concurs and concurs specially, with opinion.
SAWAYA, J., dissents, with opinion.
HARRIS, J., concurring and concurring specially:
While recognizing that the reasonable exercise of discretion by a trial judge must be upheld, such principle is inapplicable to this case. The primary obligation of any trial court, indeed its most basic responsibility, is to conduct a fair trial. It has no discretion to do otherwise. A ruling by the trial court which denies either party a fair trial cannot be excused based on the proposition that a trial court has exercised its broad discretion. If you disagree with this point, you need read no further.
For those of you remaining, let us consider the facts of this case which made this trial so unfair that reversal is the only remedy.
This action was proceeding to trial on the basis of a soft tissue injury. Indeed, Dr. Gordon, the radiologist who examined the x-rays taken of plaintiff at the emergency room, filed a report furnished to the defense indicating no visible injuries. Subsequently, Dr. Prusinski, at the request of plaintiff, performed the 1996 MRI and reported (this report was also furnished to the defense) that the MRI reflected only "bulging discs." Based on these reports indicating less serious injury, the defense chose not to depose either doctor. Instead, the defense retained Dr. Seig, an orthopedist, to conduct an IME.
The trial court set trial for January 24, 2000, and required that all expert witnesses be listed by October 15, 1999. After that time, and unknown to the defense, the plaintiff had a second MRI performed by Dr. Shapiro. And after that time, Dr. Shapiro, a radiologist, filed his report based on the new MRI finding not only a bulging disc but also "a tear in the posterior annular fibers." And after that time, Dr. Gordon was retained to examine the new MRI and found a herniated disc. Without seeking court approval to amend the witness list, plaintiff added Dr. Hanna, who had referred the plaintiff to Dr. Shapiro, and Dr. Golovac, a "pain expert," to their list. But no mention was made that Dr. Gordon who had previously been disclosed only as having read the emergency room x-rays and as having found no visible injury would now be offered in a new capacity, based on his reading of the new MRI, to testify to a herniated disc. Dr. Gordon's new involvement was not revealed until his trial testimony.
*229 The dissent finds that it was the defense's own fault that it did not discover Dr. Gordon's new role because it failed to depose him. This is a strained notion of imputed knowledge. Lawyers should not be encouraged to take unnecessary depositions which tend only to run up the costs of an already expensive legal system. A deposition of Dr. Gordon shortly after the accident would have revealed that he read the x-rays and found no visible evidence of an injury. Since this was revealed by the report furnished to the defense, why depose Dr. Gordon? Further, a deposition of Dr. Gordon at any time before the running of the time in which experts could be added by either party would have revealed the same testimony. By permitting Dr. Gordon to testify at trial in a new undisclosed capacity, the judge rendered the trial unfair. See Colonnell v. Mitchels, 317 So.2d 799 (Fla. 2d DCA 1975) (The purpose of requiring that physical examinations and discovery be completed by the time of pretrial conference is to avoid surprise at trial. A medical witness changed his opinion based upon a physical examination that took place after the discovery cutoff. A new trial was ordered because of the surprise to the other side when the witness was permitted to testify to his changed opinion at trial.); see also Office Depot, Inc. v. Miller, 584 So.2d 587 (Fla. 4th DCA 1991) (Failure to disclose to plaintiff the defense expert's changed opinion that there was no causal relationship between the accident and the injury after he previously opined that there was required a new trial.).
Here, it was not the defense which violated the court's pretrial order by listing witnesses after the time had run. And it was not the defense which disclosed a witness as having a limited and benign involvement in the case and then, after the running of the period in which to name experts, engaged that witness in a more lethal role. The courts should not permit trial by ambush regardless of which party is riding blithely through the pass.
But there is another ruling by the court which had an even greater effect on the fairness of the trial. When the defense learned of the new MRI shortly before trial and saw the new experts the plaintiff belatedly added to its witness list, it moved to strike the new witnesses as being listed too late (the defense was ignorant of Dr. Gordon's new role). The court denied the motion to strike the newly added witnesses which, under the circumstances, was appropriate. But then the defense, accepting this ruling, asked the court for the opportunity to have its own radiologist examine the new MRI so that it could properly respond to the new witnesses and the new MRI concerning the new issue now being introduced into the trial. But the court, based on plaintiff's argument that since the defense already had Dr. Seig, the orthopedist who had conducted the IME, it was entitled to no other experts, denied the motion.
The unfairness of this ruling and the prejudice it caused became apparent during plaintiffs cross-examination of Dr. Seig and plaintiff's closing argument. As predicted by the defense in moving for the opportunity to present its own radiologist, plaintiff's counsel was able to get Dr. Seig to admit that a radiologist is better equipped by training and experience to render opinions based on MRIs than is an orthopedist. Dr. Seig was further forced to admit that in his own practice he often relied on the opinions of radiologists relating to MRIs. This led to plaintiffs closing remark:
Well it makes about as much sense to rely on a Dr. Seig interpretation, a guy that is in court all of the time as an orthopedic doctor with no training in *230 radiology on this type of MRI film, to say we should take and value his opinion above that of a board certified radiologist.
The finding of the greater injury was preordained by the court's denial of the defense motion to be able to reasonably respond to new witnesses whose testimony was based on a new MRI which introduced a new issue and which the court belatedly permitted to be added shortly before trial. This made the trial unfair and this is beyond a court's discretion.
Although this reversal for a new trial necessarily vitiates the attorney's fee also at issue in this case, because the issue may present itself again at the new trial, further discussion, even if not binding on the trial court, might be of some assistance to the court on remand.[1] Neither the following nor footnote 1 should be considered as a criticism of the trial judge who was bound by existing appellate opinions. But some of the following discussion may be beneficial to the court at the new trial. In any event, it will advance the discussion started by Judge Schwartz and continued by Judge Casanueva that the application of the attorney's fees multiplier to offer of judgment cases is inconsistent with reason, fairness, and the very statute involved.
What is a "reasonable attorney's fee" under the provisions of section 768.79, Florida Statutes, when an offer of judgment is not accepted and the offeror prevails by more than 25%? Is an attorney's fee multiplier ever appropriate when fees are awarded under the authority of an offer of judgment statute?[2] If so, may a multiplier be used to further enhance a lodestar which is itself greater than the agreed upon contingency fee?[3] The supreme *231 court has not yet answered these questions in the context of an offer of judgment case.
In this case, plaintiff made an offer of judgment of $10,000 (policy limits) and recovered judgment in the amount of $159,158.22 (after PIP benefits were reduced) and was awarded $235,800 in attorney's fees when the court multiplied by two (2) a figure based on 393 hours reasonably expended at a reasonable hourly rate of $300.
In Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla.1985), the court initiated in Florida the concept of the contingency fee multiplier. Rowe held that a lawyer working under a contingency arrangement should be able to charge more as a "reasonable fee" than one who is guaranteed payment for his services because the lawyer working on a contingency will not always win. This argument has historically been used to justify a contingency fee which greatly exceeds what would otherwise be a reasonable fee determined on the basis of the number of hours spent times a reasonable hourly rate.
The purpose of the Rowe multiplier was to give the plaintiff's attorney, insofar as reasonably possible, the benefit of his contingency fee arrangements in order to encourage lawyers to continue to take cases on a contingency basis and thus better provide access to the court. But the mechanical application of the multiplier in all cases, particularly when applied in offer of judgment cases, will sometimes, as it did herein, create an excessive fee which might bring the court into the disrepute which concerned the Rowe court. In Standard Guaranty Insurance Co. v. Quanstrom, 555 So.2d 828 (Fla.1990), the supreme court cautioned against the mechanical application of the multiplier. The Rowe court recognized that attorney's fees must be determined on a case by case basis and that, because the paying party did not participate in the fee contract, the contingency fee arrangement, while it must be considered, may not be the sole basis of the fee award.
The Rowe court, in establishing the multiplier in Florida, was aware that by multiplying an otherwise reasonable fee (again, the two components: justifiable time charged at a reasonable rate) by as much as three times depending on the likelihood of success when the case was taken, an extraordinarily high fee could be reached. It therefore limited such fee, in any event, to the amount agreed upon by the contracting parties. In other words, the amount that the lawyer would agree to accept and the amount that the client would agree to pay for the representation was the maximum limit of the Rowe reasonable fee.
Under Rowe, it was contemplated that the multiplier would only be employed if the lodestar was less than the lawyer would receive under his contingency arrangement. For example, assume a 40% contingency fee and a recovery of $100,000. If the lawyer expended fifty hours at a reasonable hourly rate of $300, his lodestar fee would be $15,000, well less than his contingency fee. Assume a multiplier of 3 was justified, his "reasonable fee" would be $45,000. But since the parties agreed to a fee of only $40,000, Rowe limited the defendant to that amount. Assuming the lawyer spent only ten hours at the same reasonable hourly rate, even with the maximum multiplier, his fee would be only *232 $9,000 and, under Rowe, he would be limited to this amount. Hence, the court was willing to go only so far in protecting a contingency fee, recognizing that even a contingency fee under some circumstances might be excessive.
What if the parties' contract, as is common since Rowe, provides that plaintiff will pay a contingency portion of the recovery or the amount awarded by the court, whichever is greater? It is stating the obvious to say that this is a sham agreement. The only time a court will set the attorney's fee for plaintiff's attorney is when the defendant must pay it. Hence, the agreement actually means that while plaintiff has agreed to pay a set percentage on contingency, if the court elects to award more from the defendant, the plaintiff will pass it on to his lawyer.[4] What would happen, do you think, if the lawyer, believing he had performed well in a case in which there had been no offer, asked the court to award him 40% against his client instead of the one third to which he had agreed? Perhaps we'll never know the answer.
The supreme court in Kaufman v. Mac-Donald, 557 So.2d 572 (Fla.1990), did answer affirmatively the certified question in a medical malpractice action concerning whether the trial court could award a fee with a multiplier which exceeded the contingency amount if the agreement provided that plaintiff would pay the fee awarded by the court if such fee was greater than the contingency.[5] The facts set out in Kaufman (and in the district court's opinion which certified the question) makes an analysis impossible. Kaufman did not indicate that it was receding from the principle set out in Rowe that the amount that plaintiff agreed to pay would determine the maximum "reasonable" fee. Did the Kaufman court assume that this alternative fee agreement really was intended to bind the plaintiff to pay whatever fee the court set or did it mean that the plaintiff and his lawyer can now "authorize" the court to assess against the defendant a fee greater than the plaintiff would be willing to pay for the same services? Is a fee for representing plaintiff reasonable when assessed against the defendant if the plaintiff would not be required to pay it himself?[6] There's nothing magic about getting the plaintiff to agree that defendant should pay an excessive fee. Is a boiler plate provision, one not intended to impose a fee greater than the contingency agreed to by plaintiff, sufficient to satisfy Kaufman if the awarded fee is more than a reasonable plaintiff would be willing to pay based on his understanding with his counsel?
*233 There is a further problem with recognizing the new boiler plate provision as really binding the plaintiff to pay the court awarded fee. Suppose the awarded fee is $100,000 which amounts to the total assets recoverable from the defendant. To literally enforce the parties' agreement would legitimize the definition of fee attributed to George M. Palmer: "A contingency fee is an arrangement in which if you lose, your lawyer gets nothingand if you win, you get nothing." And that may have been the result in this case. Here, the defendants were saddled with a total judgment of almost $400,000 with insurance coverage of $10,000. Rejecting an offer of judgment is not the equivalent of winning a bad-faith settlement claim.[7] And while their insurance company must provide the insureds a defense, it is not required to pay plaintiff's attorney fees assessed against defendants. See Meyer v. Alexandre, 772 So.2d 627 (Fla. 4th DCA 2000). Therefore, under plaintiff's fee agreement, he must recover over $235,800 from the defendants before he is entitled to a dime.[8] Clearly the parties did not intend that plaintiff would pay any sum awarded by the court and, under Rowe at least, the defendant should not be required to pay as a reasonable fee more than the parties themselves would agree is reasonable if plaintiff had to pay it. Since the purpose of the multiplier is to help assure that the lawyer will obtain the benefit of his fee negotiated with his client, how can it ever be justified, except to punish the defendant, to apply the multiplier to a lodestar which already exceeds the lawyer's agreed fee?
There are several reasons why the multiplier should not be applied in offer of judgment situations.[9] First, as judge *234 Schwartz noted in Gonzalez v. Veloso, 731 So.2d 63 (Fla. 3d DCA 1999), it is illogical. To apply the multiplier in offer of judgment cases assumes that a lawyer at the outset of the case will commit himself to a contingency fee arrangement in the hope that the defendant will subsequently turn down a reasonable offer so that he can claim up to two-and-a-half times a reasonable fee.
A second reason for denying application of the multiplier in offer of judgment cases is the Quanstrom limitation: the market conditions must be shown to require it. In other words, it must be proved that but for the multiplier, plaintiff could not have obtained competent counsel in the area. Plaintiffs counsel attempted to make this showing by himself testifying that he would not have taken the case without the multiplier. Since the test is whether plaintiff would have had substantial difficulty in obtaining a competent counsel within the area to take the case without the multiplier, whether plaintiff's counsel would have taken the case only on that basis is immaterial. The question is whether other competent counsel would have done so. Plaintiff attempted to answer this question by putting on another member of the plaintiffs bar to testify that based on his conversations with several of his friends who do this type practice, his "expert" opinion is that plaintiff could not have obtained competent counsel in the area to sue a defendant insured by the insurance company involved in this action[10] without the multiplier. Was this sufficient to satisfy the Quanstrom requirement? If so, does it not mean that every time this insurer is involved, the multiplier must be applied? How about other insurance companies who have a reputation for not settling cases easily? Quanstrom made it clear that multipliers should not be applied in run of the mill cases. If this type testimony is permitted to satisfy Quanstrom, then it can justify applying the multiplier in all negligence cases.
Is this really the kind of testimony which can be offered by "experts?" Can one personal injury lawyer really predict what other personal injury lawyers will do in any given case? How do we explain all those lawyers who took this kind of case on contingency before the enactment of section 768.69? Are we to believe that if the legislature repeals section 768.69 (as it might well do) lawyers will suddenly stop taking contingency fee cases such as this one? Section 90.703, Florida Statutes, provides that expert testimony may be received only if it can be applied to evidence at trial. Plaintiff never testified that he had any difficulty in obtaining a lawyer. The first lawyer he went to took *235 the case. What evidence did the expert's testimony relate to?
A third reason for denying application of the multiplier in offer of judgment cases was well developed by Judge Casanueva in his dissent in Pirelli Armstrong Tire Corp. v. Jensen, 752 So.2d 1275 (Fla. 2d DCA 2000). Judge Casanueva based his opinion on equal protection guarantees. It can just as well be argued that to apply the multiplier in offer of judgment cases is contrary to clear legislative intent. The legislature in section 768.79 carefully crafted a party neutral fee provision to encourage settlement by assessing identical risks against each party if an offer is improperly rejected. By applying the multiplier (applicable only to plaintiffs), the courts will have destroyed the neutrality intended by the legislature and will have given great advantage to plaintiff: "If I lose, I must pay your reasonable fee; if you lose, you must pay up to two-and-a-half times my reasonable fee." The supreme court emphasized that the "criteria and factors" utilized in setting a reasonable attorney's fee "must be consistent with the purpose of the fee-authorizing statute or rule." Quanstrom, 555 So.2d at 834. Granting a multiplier for only one of the parties would not be consistent with the purpose of the offer of judgment statute which is to put both parties on the same footing when reasonably evaluating the case.[11]
A fourth reason why the multiplier was unjustified in this case is that the lodestar determined herein (based on justifiable hours spent at a reasonable rate) was $117,800 and is sufficient without a multiplier to encourage attorneys to take similar cases. In other words, the policy reason justifying the multiplier is not present in this case. The lodestar alone was substantially more than twice the amount the lawyer would have received under his contingency fee contract. The legislation authorized assessing against the one who improvidently rejects an offer "a reasonable fee." A fee which exceeds that amount simply is unauthorized by the statute and should not be approved by the court. If courts are not reasonable in assessing attorney's fees, the legislature may well remove our authority to do so. To impose a multiplier when the lodestar already exceeds the contingency fee is to ignore the first seven criteria set forth in Rowe and to make the eighth criteria (whether the fee is contingent) the sole basis for the greater fee and risks making the court an "instrument of enforcement, as against third parties, of excessive fee contracts." See Rowe, 472 So.2d at 1146.
A fifth reason, similar to the fourth reason, is the Rowe limitation mentioned earlier. It is inconceivable that the plaintiff would ever agree to pay or that the attorney could reasonably expect his client to pay a fee of $235,800 to collect a judgment of $159,158.22. And yet if the contingency fee arrangement is supplanted by the fee awarded by the court, he has done just that. To require the defendant in an offer of judgment case to pay more than the parties really intended that plaintiff would pay if he were responsible for the fee does not establish a reasonable fee for plaintiff; it imposes a punitive award against the defendant.
SAWAYA, J., dissenting.
I respectfully dissent.
*236 The instant case is neither a case where the plaintiffs radiologist was an undisclosed, surprise witness nor is it a case where the trial judge conducted a "trial by ambush." Rather, the record reveals that the defendants failed to engage in discovery prior to the discovery deadline established by the trial court that would have allowed them to obtain the information they now so bitterly complain they did not have prior to trial. Now the defendants use their failure as an excuse to avoid an adverse judgment and, unfortunately for the plaintiff, they have succeeded.

The Plaintiff's Radiologist Was Not An Undisclosed, Surprise Witness
The majority contends that Dr. Gordon was an undisclosed, surprise witness because the Answer to Expert Interrogatory filed by the plaintiff limited Dr. Gordon's testimony to the care and treatment of the plaintiff, which was confined to his examination of the x-rays taken shortly after the accident. The majority also contends that the plaintiffs November 1999 deposition failed to put the defendants on notice that he would offer testimony regarding subsequent MRIs performed on the plaintiff and the injuries the MRIs revealed.
The procedural history of this case belies the notion that the defendants were surprised by the testimony of Dr. Gordon at trial. The record reveals that this case involved a rear-end collision caused by the defendants and that the primary dispute between the parties was whether the plaintiffs injuries were caused by the accident, as the plaintiff contended, or whether, as the defendants contended, they were caused by natural degenerative processes.
Proximate causation, which was the only liability issue submitted to the jury, necessarily requires a determination of the specific injury before an opinion can be rendered as to what caused it. See McCain v. Florida Power Corp., 593 So.2d 500, 502 (Fla.1992). The record clearly establishes that Dr. Gordon had been listed numerous times throughout the course of this litigation as the plaintiffs expert in radiology. A radiologist is a medical doctor who examines and interprets diagnostic tests such as x-rays and MRIs and renders opinions regarding injuries or other medical conditions revealed by those tests.
After the plaintiff began to experience additional medical problems which led him to Dr. Hanna for treatment during the latter part of 1999, an MRI was performed and a report issued by Dr. Shapiro comparing the 1999 MRI with a previous MRI performed in 1996. Dr. Gordon was asked to review the MRIs "several weeks" before trial, well within the discovery period established by the trial court. The defendants received a copy of Dr. Shapiro's report on December 28, 1999, almost two weeks before the January 10, 2000 discovery cutoff date. On January 18, the defendants filed a motion for continuance strenuously arguing that they needed the additional time to retain their own radiologist (a neuroradiologist) to render an opinion at trial regarding the MRIs.
Thus the defendants knew that Dr. Gordon had been continuously listed as the plaintiffs expert in radiology; they obtained a copy of the 1999 MRI report disclosing the plaintiffs injuries; and they knew the key issue being litigated was whether the accident caused the plaintiffs injuries. Given this knowledge and the defendants' strongly-held view regarding the importance (to them) of having a radiologist review the MRI and render an opinion at trial with regard to the cause of the plaintiffs injuries, I find it incredulous that the defendants would argue that they were surprised that the plaintiffs radiologist, Dr. Gordon, would do likewise. In my view, to say otherwise attributes to the defendants' lawyers a degree of naivete, *237 gullibility, and ignorance of trial procedure in personal injury cases that is not supported by the record. I firmly believe that the defendants expected the plaintiff's radiologist to testify at trial regarding these issues when they received the MRI report, and that is why they wanted their own radiologist to counter the testimony they inevitably saw coming. Moreover, if the defendants had any doubts about this, they, having ample time prior to the discovery cut-off date established by the court and even more time prior to the trial, could have inquired of the plaintiff whether Dr. Gordon was going to offer such an opinion and then depose him. In my view they failed to do so at their own risk.
The majority and concurring opinions emphasize that the report of the 1996 MRI shows "bulging discs"; the report of Dr. Shapiro regarding the 1999 MRI shows "a bulging disc with a tear in the posterior annular fibers"; and that Dr. Gordon testified that the MRIs showed "herniated discs." However, according to the doctors who testified, whether a disc condition is labeled a "bulge" or a "herniation" is often a matter of semantics. The doctors testified that whether an injury is called a "bulging disc" or a "herniated disc" depends on the doctor who examines the MRI because some might call a disc protrusion a "bulge" while others might refer to the same protrusion as a "herniation." Even Dr. Seig, the defendants' expert witness, after admitting that the MRIs showed "bulges" which he said were normal, testified that other doctors might call those very same bulges "herniations." Specifically, Dr. Seig, in describing the difference between "bulges" and "herniations," explained that two doctors could look at the same MRI and describe the same injury using "different words" and admitted that the line between characterizing a disc as having a bulge or a herniation is arbitrary.
Semantics aside, the significant finding reflected in the 1999 MRI, when compared to the 1996 MRI, is that there had been no significant change in the plaintiff's condition since the 1996 MRI was performed. This establishes that the injuries suffered by the plaintiff were not caused by natural degenerative processes, but were the result of the accident caused by the defendants. This fact contradicts the testimony of the defendants' expert witness, Dr. Seig, who essentially testified that the plaintiff's injuries were caused by degenerative processes. Thus the need for Dr. Gordon's testimony, given the fact that the central issue in dispute between the parties was causation, was triggered by the 1999 MRI.
The majority and concurring opinions contend that the plaintiff failed to disclose in his Answer to Expert Interrogatories and the deposition of the plaintiff taken in November 1999 that Dr. Gordon would testify regarding the MRIs and the injuries they revealed. However, the plaintiff could not have revealed this in his Answer to Expert Interrogatories because the 1999 MRI did not exist at the time he answered the inquiry. The plaintiff answered the expert interrogatories on September 9, 1999, several weeks before he started experiencing the medical problems that led him to seek the subsequent medical treatment that eventually led to the MRI. That MRI was performed in October 1999.
Regarding the deposition, I have read the transcript of that inquiry which took place in November 1999, and it consists of thirty-six pages taken over the period of one hour. The vast majority of the questions asked by the defendants concerned the plaintiffs work history, activities, and performance. The plaintiff was never asked whether he had any other MRIs performed since the last one taken in 1996 *238 or whether he had retained any experts to render opinions regarding a comparison of the 1996 and subsequent MRI. Thus the reason that the defendants learned nothing from the deposition that would put them on notice that Dr. Gordon would offer expert testimony regarding the MRIs is because they never asked.
Under the Florida Rules of Civil Procedure, with one exception not relevant to these proceedings,[1] there is no continuing duty to supplement discovery requests including answers to expert interrogatories. Binger v. King Pest Control, 401 So.2d 1310, 1312 n. 4 (Fla.1981) ("There is no continuing duty of disclosure under Florida's Rules of Civil Procedure, as there is under our criminal rules. See Fla. R.Crim. P. 3.220(f)."). Moreover, there is no prohibition that I know of that prevents expert witnesses from continuing to obtain new or supplemental information regarding their opinions that might necessitate formulating new opinions during the preparation for their testimony at trial. See e.g., Davis v. Pfund, 479 So.2d 230 (Fla. 3d DCA 1985), rev. denied, 491 So.2d 280 (Fla.1986).
The majority contends that the answer given by the plaintiff to the expert interrogatory limited Dr. Gordon's testimony to the care and treatment of the plaintiff and his examination of the x-rays. The majority then adopts a rule which states that "[w]hen a party converts a treating physician into an expert to testify on matters unrelated to his care of the patient, the other side should be notified." As explained seriatim, I do not believe that this rule applies to the instant case.[2]
It must first be determined whether the plaintiffs answer states that Dr. Gordon's testimony would be limited to "care and treatment" as the majority contends or whether, as the plaintiff argues, the answer states that the doctors will also testify to causation of the plaintiff's injuries. The majority contends that its interpretation of the answer is correct because Dr. Gordon originally examined the x-rays which revealed no injuries and, therefore, he could offer no testimony regarding causation. To me, this makes no sense because, as I have previously explained, causation of the plaintiff's injuries was the central liability issue in this case. Thus the plaintiff listed the witnesses whose testimony would be offered to prove the issues in the case, and for the defendants to now imply that they had no idea after they received the 1999 MRI report that Dr. Gordon would be asked to review the MRI and testify to the injuries it revealed is disingenuous. Moreover, this argument was made to the trial court and the trial court rejected the notion that Dr. Gordon *239 was limited to testifying about care and treatment based on the x-ray.
The majority opinion states that Dr. Gordon had been "identified as nothing more than the post-accident emergency room x-ray-reading radiologist who had written a report reporting no injury." However, Dr. Gordon was listed as the plaintiffs expert in radiology numerous times. I have found nothing in the record which indicates that the plaintiff ever informed the defendants that Dr. Gordon's testimony would be limited to the x-rays, that the plaintiff would not undergo further diagnostic testing, or that Dr. Gordon would not be asked to review subsequent diagnostic tests and render an opinion based thereon.
The defendants argued to the trial court and in these proceedings that they were prejudiced because they did not have the opportunity to retain their own radiologist to review the MRIs and counter Dr. Gordon's testimony. I find this argument unpersuasive because the defendants had retained Dr. Seig as their medical expert early in the litigation and they consistently listed him on their expert witness list. Dr. Seig conducted the defendants' IME and rendered an opinion regarding the findings from the 1996 MRI in his report. Dr. Seig, an orthopedic surgeon, was described by plaintiffs counsel as a "highly skilled witness," and the record reveals that he is an experienced trial witness with exceptional credentials and qualifications. I reviewed his trial testimony and he did testify regarding both MRIs and rendered an opinion that there was little if any difference between the two and that the plaintiffs injuries were caused by natural degenerative causes rather than the accident.
Moreover, after the defendants discovered the existence of the 1999 MRI (they knew about the 1996 MRI since the beginning of the litigation), they made no effort to obtain the services of a radiologist despite the fact that they had ample time prior to trial to do so. Therefore, this is not a case, as the concurring opinion suggests, where the trial court, after refusing to strike the plaintiffs witnesses, refused to allow the defendants to have a radiologist of their choosing testify about the 1999 MRI. Rather than make an effort to retain a radiologist and ask permission of the trial court to allow him or her to testify, the defendants, who now so bitterly claim prejudice, did nothing more than file a second motion for continuance on January 18, 2000, only six days before the commencement date of the trial and almost three weeks after they discovered the existence of the 1999 MRI, complaining that they needed another continuance.
Additionally, the defendants' motion to strike, emphasized in the concurring opinion, was an ore tenus motion made at the conclusion of the hearing on their motion for continuance after the trial court asked defendants' counsel whether she had attempted to depose the doctors, or whether she had moved to strike them. After answering "No," defense counsel then made the oral motion to strike, which was promptly denied by the trial court. In my view, the oral motion to strike was nothing more than an afterthought prompted by questioning from the court.
The majority cannot point to any rule of civil procedure or court order relating to discovery that the plaintiff has violated to warrant reversal. Moreover, in my opinion, the two cases it cites are distinguishable from the instant case. The decision in Suarez-Burgos v. Morhaim, 745 So.2d 368 (Fla. 4th DCA 1999), rev. denied, 767 So.2d 461 (Fla.2000), involved a doctor who conducted an independent medical examination of the injured plaintiff pursuant to Florida Rules of Civil Procedure 3.160. The doctor initially rendered a report that did not disclose his opinion that the injury was not caused by the accident, and then *240 attempted to testify at trial and relay this opinion without having previously disclosed it in clear violation of the rule. In Department of Health & Rehabilitative Services v. J.B., 675 So.2d 241 (Fla. 4th DCA 1996), the plaintiff's attorney represented to the defendant and to the court that he would not introduce a life care plan at trial, and subsequently attempted to introduce such a plan at trial.

The Trial Court Did Not Abuse Its Discretion
The decisions in Morhaim and J.B. hold that the decision whether to allow an undisclosed witness to testify should be governed by the standard adopted in Binger. Thus assuming that Dr. Gordon was an undisclosed surprise witness as the majority finds, the issue that must be addressed and resolved is whether the trial court abused its discretion in allowing Dr. Gordon to testify pursuant to the standard adopted in Binger, where the Florida Supreme Court held that trial judges
should be guided largely by a determination as to whether use of the undisclosed witness will prejudice the objecting party. Prejudice in this sense refers to the surprise in fact of the objecting party, and it is not dependent on the adverse nature of the testimony. Other factors which may enter into the trial court's exercise of discretion are: (i) the objecting party's ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness; (ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case (or other cases). If after considering these factors, and any others that are relevant, the trial court concludes that use of the undisclosed witness will not substantially endanger the fairness of the proceeding, the pretrial order mandating disclosure should be modified and the witness should be allowed to testify.
Id. at 1314 (footnotes omitted). The decision in Binger also applies to cases where a party fails to properly disclose a new opinion or a change of opinion. See J.B. The majority did not apply this analysis to the instant case. However, since this is the standard that the Florida Supreme Court says should be applied, I will apply it.
In order to show prejudice under Binger, the defendants have to show that they were surprised by the testimony of Dr. Gordon. The courts generally agree that a party cannot claim surprise if it knows, or has the means available to it to know, what testimony will be introduced against it at trial. Pascual v. Dozier, 771 So.2d 552, 554 (Fla. 3d DCA 2000) ("However, plaintiff failed to conduct any discovery of either IME doctor. Based on this record, we cannot agree with plaintiffs claim of surprise that the IME doctors intended to testify regarding the cause, reasonableness and necessity of her medical treatment."); see also Tomlinson-McKenzie v. Prince, 718 So.2d 394, 396 (Fla. 4th DCA 1998) ("Further, an objecting party may not, having closed its eyes to the existence of evidence prior to trial, claim that the admission of that evidence would disrupt the orderly and efficient trial of the case."); Bowen v. Manuel, 144 So.2d 341, 343 (Fla. 2d DCA 1962) (holding that one who knows, or has full means of knowing, what evidence or contentions are likely to be introduced against him is not entitled to claim surprise). I have previously discussed why I believe the defendants were not surprised by the testimony of Dr. Gordon. I also feel the defendants had the means available to them to know what testimony would be introduced against them because they had ample time after they received the 1999 MRI report to discover Dr. Gordon's testimony, and they failed to do so.
*241 In addition, the other factors set out in Binger militate strongly against the exclusion of Dr. Gordon's testimony. There was no finding that the plaintiff failed to answer the interrogatory or questions in the deposition in bad faith. The record reflects that the plaintiff advised the defendants that he would cooperate if the defendants wanted to take Dr. Gordon's deposition, but the defendants never attempted to do so. I consider the defendants' argument to be a clear example of a party, "having closed its eyes to the existence of evidence prior to trial, claim[ing] that the admission of that evidence would disrupt the orderly and efficient trial of the case," and I soundly reject it. See Tomlinson-McKenzie, 718 So.2d at 396.
Applying the Binger standard, this court held in Utica Mutual Insurance Co. v. Pennsylvania National Mutual Casualty Insurance Co., 639 So.2d 41 (Fla. 5th DCA), rev. dismissed, 649 So.2d 234 (Fla. 1994), that the admission of expert testimony of a witness in an insurance dispute was not an abuse of discretion, despite the late notice by the party offering the testimony, where the opposing party was afforded the opportunity to depose the witness the night before the trial and declined to do so. If this court did not find an abuse of discretion in Utica Mutual because the undisclosed expert witness could be made available for deposition the night before trial, surely no prejudice can be established by defendants under the facts and circumstances of the instant case.
Moreover, the courts consistently agree that a trial court should exercise extreme caution and only exclude the testimony of a witness under the most compelling of circumstances. Pascual; Louisville Scrap Material Co. v. Petroleum Packers, Inc., 566 So.2d 277, 278 (Fla. 2d DCA 1990) ("Excluding the testimony of a witness is a drastic remedy and should be invoked only under the most compelling circumstances.") (citation omitted); Davis; First Republic Corp. of America v. Hayes, 431 So.2d 624, 626 (Fla. 3d DCA), rev. denied, 441 So.2d 632 (Fla.1983); see also Tomlinson-McKenzie, 718 So.2d at 396 ("`Excluding the testimony of a witness is a harsh remedy which should be invoked sparingly.'") (quoting Aguila-Rojas v. City Mgmt. Group Corp., 606 So.2d 765, 766 (Fla. 3d DCA 1992); Conde v. Marlu Nav. Co., Ltd., 495 So.2d 847 (Fla. 3d DCA 1986).) In my view, the instant case does not present the sort of compelling circumstances that would have required the exclusion of Dr. Gordon's testimony.

Conclusion
I am of the view that if epigrams are to be used in judicial opinions, they should fit the facts of the case. Although I generally do not bother to respond to them, I have admittedly succumbed to the irresistible temptation to respond to the concurring opinion which asserts that the defendants were ambushed as they went "blithely through the pass." In my view, it is more accurate to conclude that the defendants embarked upon a journey down an unfamiliar road without asking directions from anyone; took a wrong turn and proceeded over a cliff; and, as they descended to the ravine, loudly proclaimed their misfortune to be the fault of those who did not volunteer to guide them along the way.
In Binger, the court held that the concept of disclosure of witnesses and evidence is not without its limit when it stated:
Nothing in this concept of trial practice requires that one party disclose his case to the other in full. We are dealing only with an exchange of witnesses' names. It remains the obligation of each attorney to learn through interrogatories, depositions or any other means he selects, the nature of the testimony which will be offered and the extent to which he intends to meet or deal with it at trial. *242 Negligence in discovery is not an issue in this case.
Binger, 401 So.2d at 1313 n. 7. Although negligence in discovery was not an issue in Binger, I believe it is an issue in the instant case. The defendants made a conscious decision not to discover what testimony Dr. Gordon would offer after they received the 1999 MRI report. The only effort the defendants made was to file their second motion for continuance six days before trial. Moreover, the defendants never took any doctor's deposition, not even the depositions of Drs. Hanna and Golovac after they were revealed in the plaintiff's last deposition taken in November 1999. The record reveals that defendants did precious little to prepare this case for trial and they proceeded at their own risk.
The defendants' negligence caused the plaintiff's injuries and they now attempt to use their negligent discovery as an excuse to take away the plaintiff's verdict rendered by the jury to compensate him for those injuries. I believe it is time for the defendants' negligence to stop.
NOTES
[1] I also disagree with Dungan v. Ford, 632 So.2d 159 (Fla. 1st DCA 1994), which was relied on in denying the defense the opportunity to challenge the reasonableness of some of the services performed by Dr. Seconi who, in attempting to support the reasonableness of his charges, testified that his treatment was both reasonable and necessary. There are two components to a reasonable feea reasonable rate applied to justifiable services. By denying the defense the right to challenge the justification for the services, the court denied it the opportunity to challenge the reasonableness of the fee. While it is true that one is responsible also for the medical malpractice of a doctor whose services are required because of his negligence, he has never been required to pay the doctor for that privilege. Here, Dr. Seconi was not alleged by the plaintiff to be guilty of malpractice. Instead, the doctor was called as a witness to relate injuries to the accident and to testify as to the reasonableness of his charges for the purpose of assessing them against the defendant. As a witness, the good doctor is not immune from challenge. If the jury believes that the doctor provided unnecessary treatment either because of incompetence or in order to pad his bill, the jury may choose to disbelieve the doctor's testimony on other points as well. This is called impeachment and the truth cannot be found without it. One might reasonably ask, as between the plaintiff and the defendant, who should pay for the unjustified services. The answer is neither.
[2] We have given mixed, if not conflicting, signals. In Garrett v. Mohammed, 686 So.2d 629 (Fla. 5th DCA 1996), we held that a multiplier may apply in offer of judgment cases. However, in Strahan v. Gauldin, 756 So.2d 158, (Fla. 5th DCA 2000), rev. granted, (Table No. SC00-1155), 786 So.2d 1189 (Fla. Feb. 2, 2001), and Internal Medicine Specialists, P.A. v. Figueroa, 781 So.2d 1117 (Fla. 5th DCA 2001), we held that although multipliers may theoretically apply in offer of judgment cases, as a practical matter, if it can ever be justified by proof it will be extremely difficult to do so.
[3] The supreme court in Standard Guaranty Insurance Co. v. Quanstrom, 555 So.2d 828 (Fla.1990), emphasized that there are two "caps" on the amount of attorney's fees that can be awarded even under the malpractice statute then in effect. One cap is the amount agreed to by the parties. The other cap is on the amount of the multiplier so that the awarded fee "would not be significantly different in amount than it would be absent the statutory provision." The first cap limited the fee to the parties' agreement; the second cap was to insure in so far as reasonably possible that the awarded fee would reimburse plaintiff for the fee he obligated himself to pay his attorney.
[4] In fact, that is precisely what the client agreed to in this case: "If any suit brought on my behalf entitles me to have the defendant pay my attorney's fees, then I agree to pay [my attorneys] those fees as determined by the court or the above contingency, whichever is greater."
[5] This was in the nature of a trick question because, under Rowe, the court could never award more than the plaintiff himself agreed to pay. Since plaintiff by this alternative fee agreement never intends to himself pay more than his contingency under any circumstance, under the reasoning of Rowe the limitation remains the same.
[6] The attorney's fee provision under section 768.69 was not intended to punish the nonaccepting party for refusing to accept the offer. It was simply intended to reimburse the other party for the cost of additional attorney's fees required because of the failure to accept a reasonable offer. It was not intended to increase the lawyer's fees from what he would have otherwise received. "There clearly was no intent on the part of the legislature to increase the amount of attorney's fees in this type action [prevailing party case] for the prevailing party's counsel." Quanstrom, 555 So.2d at 831. It was certainly not the intent of the legislature to do so in offer of judgment cases.
[7] And there is no assurance that a subsequent bad-faith claim will be successful. As the supreme court stated in Vest v. Travelers Insurance Co., 753 So.2d 1270, 1275 (Fla.2000):

The insurer has a right to deny claims that it in good faith believes are not owed on a policy. Even when it is later determined by a court or arbitration that the insurer's denial was mistaken, there is no cause of action if the denial was in good faith. Good-faith or bad-faith decisions depend upon various attendant circumstances and usually are issues of fact to be determined by a fact-finder.
[8] Does this present a problem under Rule 4-1.5, Rules of Professional Conduct?
[9] In response to questioning from the Bench as to why the contingency multiplier should be applied in offer of judgment cases, appellee's counsel's only response was that other appellate courts (and this one) had so held. Because we are not bound by other appellate courts (and we can change precedent of this court by en banc review), this was, at least to me, an insufficient answer. I am not nearly as concerned with what other courts have ruled as I am with why they so ruled. Lawyers must be able to compare and distinguish, to support and justify. The reason most commonly relied on by the other courts in holding the contingency multiplier applicable to offer of judgment cases is that by referring to the supreme court guidelines, the legislature authorized consideration of the contingency factor (hence the contingency multiplier) in setting the "reasonable fee." The problem with this position, I submit, is that the legislature minimized its general reference to the supreme court guidelines by emphasizing that the court must rely on additional, offer of judgment specific factors in determining an appropriate fee under section 768.79. These additional factors have not been considered by the supreme court in any of its prevailing party cases. If you view the offer of judgment provision relating to fees in its entirety, it seems clear that the legislature did not contemplate a contingency fee multiplier. Such a multiplier is inconsistent with the policy encompassed within section 768.79(7)(b) which is to determine the amount of the fee based on the merits of the case, the number and nature of the offers made, the closeness of the questions of law and fact, whether information was withheld so that a proper evaluation of the case could not be made, whether the action was a test case presenting questions of far reaching importance, and the amount of additional delay and costs caused by the rejection of the offer. The legislative reference to the supreme court guidelines was merely to assist the court in determining a reasonable hourly rate which determination might take into account the contingency nature of the fee contract for the additional services required after the rejection of the offer which would then be subject to modification based on application of the mandated legislatively specified factors. This differs from the fee provision considered in Rowe which, perhaps in part because of Rowe, was repealed and a new attorney's fee provision substituted which has adopted the offer of judgment standard. See § 766.209(2), Fla. Stat. (2000). Under the statutory provision considered in Rowe, there were no additional, specific factors to consider. As much as I respect the other courts which have found to the contrary, because I disagree with their why, I do not find their what persuasive.
[10] This is indeed an interesting proposition. The plaintiffs' bar claims a right to a higher fee because the defendants' insurance carrier routinely asserts its right to access to the courts. The fact that the plaintiffs' bar urges application of the multiplier because this insurance company claims the right to trial by jury is understandable; that the position obtained judicial acceptance is not.
[11] The fact that imposition of a contingency multiplier is inconsistent with the offer of judgment case is apparent from looking at Rowe and comparing it with sections 768.79(7)(b)1 and 3. Under Rowe, the amount of the multiplier increases as plaintiff's likelihood of success decreases. A fair reading of the statute, however, indicates that the apparent lack of merit of the claim and the closeness of the issue should decrease the amount of fee awarded, not increase it.
[1] Rule 1.360(b), Florida Rules of Civil Procedure, requires disclosure of substantial changes or reversal of opinion contained in an original report prepared by a physician who performs an independent medical examination under the rule.
[2] Assuming the applicability of the rule to the instant case, the conversion element of the rule makes little sense. For example, the majority holds that it was error to permit Dr. Gordon, who had been disclosed as an expert in radiology from the beginning of the litigation, to testify because he prepared an opinion for trial purposes after his care of the plaintiff ended, which was not disclosed by the plaintiff, because the defendants never requested it. Nevertheless, Dr. Golovac, who was not added as a witness until December 29, 1999, long after the disclosure deadline of October 15, was permitted to testify because he had not been "convert[ed]" from a treating physician even though his opinion had not been disclosed because the defendants did not request that one either. The most interesting aspect of this is that Dr. Golovac also testified to a comparison of the two MRIs and rendered the same opinion as Dr. Gordon. Yet it was permissible for Dr. Golovac to testify, but reversible error to allow Dr. Gordon to testify.