930 So.2d 659 (2006)
Ira POSNER, M.D., Ira Posner, M.D., P.A., Appellants,
v.
William Leslie WALKER, etc., et al., Appellees.
No. 3D04-1796.
District Court of Appeal of Florida, Third District.
February 22, 2006.
Rehearing Denied June 27, 2006.
*660 Hicks & Kneale, and Mark Hicks, and Dinah Stein, Miami, for appellants.
Ginsberg & Schwartz, and Arnold R. Ginsberg; Goldberg & Hirsh, and Jeffrey Stephen Hirsh, Miami, for appellees.
Before, LEVY, RAMIREZ, and SUAREZ, JJ.
*661 RAMIREZ, J.
Ira Posner, M.D. and Ira Posner, M.D., P.A. appeal the trial court's final judgments in the amount of $1,925,000.00 entered on a jury verdict in favor of William Leslie Walker and Gregory Keith Strickland. During more than ten years, Dr. Posner treated Patsy Walker for various ailments and wrote numerous prescriptions for pain. She died from a drug overdose from medication prescribed by a different doctor. We reverse because we conclude that the plaintiffs failed to establish any breach of Dr. Posner's standard of care in his treatment of Walker.

I. The Treatment
Dr. Posner, a board-certified orthopedic surgeon, had been treating Patsy Walker since January 1985, initially for a back injury she suffered at her nursing job. Dr. Posner observed that Walker was suffering from recurring blood clots in her right leg and a pinched lumbo-sacral nerve root. He restricted Walker's lifting and prescribed anti-inflammatory medications. Walker's pain worsened, and she was hospitalized to receive stronger, intravenous pain medications. She was discharged and again hospitalized for the pain in October.
Walker's hospitalizations were helpful at first, but the pain returned, so she continued to see Dr. Posner. By January 1986, Walker was having terrible pain again in her back. Dr. Posner performed a myelogram, which was negative. He gave Walker epidural steroid injections to treat the pain in her sciatic nerve. In 1986, Walker underwent a hemorrhoidectomy, which improved her pain. In June 1986, Dr. Posner gave her a final, 30-day prescription for Tylenol No. 3, a short-acting opioid, and discharged her from his care.
Dr. Posner did not hear from Walker again until November 1986, when, after reinjuring herself at work, she returned to him with pain. When Walker failed to respond to Dr. Posner's treatments, she was hospitalized for her pain again in December 1986.
During this period, Dr. Posner prescribed physical therapy for Walker, which she received many times over the years, not always helping her and sometimes worsening her pain. In December 1987, Dr. Posner again discharged her from his care.
In March 1988, Walker fell in the shower and was taken to an emergency room, where she was diagnosed with a compression fracture of one of her vertebrae. Dr. Posner treated her again. Although the fracture resolved, the pain persisted, and Dr. Posner prescribed therapy and Tylenol No. 3.
In March 1989, Dr. Posner recommended to Walker that she seek treatment at a pain clinic run by Dr. Hubert Rosomoff at the University of Miami. Walker refused. Dr. Posner gave her a prescription for 30 more Tylenol No. 3 and discharged Walker from his care.
In April 1989, Walker fell and fractured three ribs. Although the ribs healed, Walker returned in May because of a reexacerbation of the pain in her back and leg. She continued to see Dr. Posner from time to time. During this period, Dr. Posner treated her pain with Percocet (a pain narcotic), Tylenol No. 3 or an anti-inflammatory.
In October 1990, Walker called Dr. Posner and told him that she had run out of Percocet, had not taken any for four days, and was in unbearable pain. Dr. Posner sought another opinion. Dr. Basil Yates, a neurosurgeon, repeated all of the studies on Walker, and in January 1991, determined that Walker did not have any reason to hurt and thus did not need treatment.
*662 Due to Walker's physical manifestations of pain, Dr. Posner disagreed with Dr. Yates' conclusion that Walker did not require treatment. Dr. Posner also rejected a request by a claims examiner that he stop prescribing narcotics for Walker, concluding that the decision involved medical judgment and that Walker needed medication to control her pain.
In March 1991, Dr. Posner again suggested to Walker that she obtain alternative treatment at the pain clinic. Walker again refused. Dr. Posner then had Walker evaluated by Dr. Lebwohl, an orthopedist at the University of Miami, for another opinion. Dr. Lebwohl evaluated Walker in July and September. Although he found a vascular abnormality in her spine, he did not believe it was contributing to the pain. Thus, he could not help her surgically. Dr. Lebwohl did conclude, however, that Walker was suffering from chronic pain. He also noted the same injuries to Walker's nerve roots that Dr. Posner had seen in 1985.
Dr. Posner continued to treat Walker for her pain and prescribed Percocet for her in 30-pill dosages. Walker was injured again in August 1991; her leg and back pain returned and her calf contracture worsened. Dr. Alvin Stein, an orthopedic surgeon, observed that Walker's contracture was in a locked position and diagnosed Walker as showing classic symptoms for reflex sympathetic dystrophy.
In April 1992, Walker again had to be hospitalized so that she could be given stronger drugs to control her pain. Walker's pain was brought under control, but a month later her muscle contracture worsened to the point where she was walking on her toes. Dr. Posner operated on Walker's leg, which was successful and she was able to walk normally again, but her pain continued.
In October 1992, Dr. Posner learned that Walker was obtaining opioid medications from two physicians other than himself. Dr. Posner spoke to the other two physicians about not prescribing any pain medication to Walker and was told that they would not. Dr. Posner told Walker that she would have to stop seeking medication from other doctors.
Walker's pain continued, so Dr. Posner suggested to Walker that she be seen by a pain management team that he had formed. Dr. Posner's team consisted of himself, an anesthesiologist for interventional pain treatment, physical therapists for biofeedback and exercises, a psychologist to treat patients for the stress, an addictionologist to deal with withdrawals from pain medications, and a physiatrist to address rehabilitation. At that time, the only other pain clinic in South Florida was the one run by Dr. Rosomoff at the University of Miami. As part of her treatment, Walker was evaluated by the Dr. Posner's team addictionologist, Dr. Richard Weiss.
In July 1993, the pain team received a report from a pharmacist that Walker was misusing her prescription injectable morphine by directly injecting it instead of putting it in the pump. Also, Walker's family reported that Walker was becoming incoherent. The team decided they needed to get Walker off of the medications so that they could see what her level of pain was. The pain team ceased all medications and told Walker that that they would no longer provide her with medication unless she agreed to hospitalization and detoxification.
Following an automobile accident, Walker was admitted to a detoxification center on July 10, 1993. However, Walker left the center the next day against the advice of the admitting physician. Walker subsequently *663 informed the pain team that she had ceased all medications on her own and had gone through withdrawal, thus detoxifying herself. However, Walker soon returned to having terrible, intractable pain. The pain team met again to discuss how to continue Walker's treatment. Dr. Weiss determined that she was probably addicted to her medications, but that she had a chronic pain syndrome that was causing her to use high doses of medication. Dr. Weiss concluded that Walker required continued narcotics to control her pain.
One of the pain team doctors then proposed placing Walker on MS Contin, an opioid analgesic that was new to the practitioners. MS Contin differed from the other drugs Walker had used in that it would last eight to twelve hours. The pain team believed it would more effectively control Walker's pain. At the next pain team meeting in August 1993, Dr. Weiss advised that he was prescribing Walker MS Contin at the rate of two pills per day. She was also receiving Percocet from Dr. Posner. Dr. Posner concluded that Walker was obtaining the medications from both doctors because one medication alone was not working adequately and she was attempting to control her pain with additional medication.
In September 1993, the pain team decided that they could not treat Walker without narcotics because of her severe levels of pain. By November 1993, the MS Contin had improved Walker's pain. Both Walker and the pain team were satisfied with her treatment. By December, however, Walker started to experience more pain in her body, which the pain team believed was caused by the spread of her reflex sympathetic dystrophy.
In September 1994, Walker's insurance company obtained a second opinion from Dr. Halperin, a hand surgeon, who concluded that Walker did not require treatment for her dystrophy. The entire pain team disagreed with Dr. Halperin, but they were willing to try his approach, which was to take Walker off all opioid medications. Walker was again referred to Dr. Weiss, the addictionologist. By October 16, Dr. Posner noted that Walker's pain was worsening as her medication levels were decreased.
Walker then started to obtain prescriptions for MS Contin from Dr. Barbara Mazzella, a physician with whom Walker had become acquainted through a support group. Dr. Posner was completely unaware of Dr. Mazzella. Walker did not tell Dr. Posner about Dr. Mazzella, and Dr. Mazzella never contacted him. Dr. Mazzella was providing Walker with prescriptions for other medications as well, such as Valium, injectable morphine ampoules, and a morphine syringe. These medications were not, in Dr. Posner's opinion, medically appropriate and were "extremely dangerous."
In the meantime, the pain team was increasing Walker's MS Contin dosages to respond to her increasing pain. Walker and her insurer were refusing to use and pay for an implantable pump. However, by May 15, 1995, it seemed that Walker's pain stabilized. Dr. Posner believed the treatment was going well.
Dr. Posner saw Walker for the last time on June 9, 1995. He advised her to decrease her medications. He was not aware that, three days earlier, Dr. Mazzella had prescribed Walker injectable morphine, Valium, Percocet, and a syringe, and did not suspect that Walker had failed to follow his instruction to only obtain medication from him. During that visit, Dr. Posner gave Walker a prescription for 180 MS Contin pills for her pain.
Later that day, Walker was involved in an automobile accident and treated in an *664 emergency room for bruises. The hospital apparently gave Walker more MS Contin and discharged her. Dr. Posner was not notified of the accident. On the night of June 12, 1995, Walker fell asleep while watching television and died the next morning in her sleep. The coroner determined that Walker died from acute broncho-pneumonia due to or as a consequence of a combined overdose of morphine sulfate, diazepam (Valium), and phenobarbital. At the time of her death, the bottle of 180 pills that Dr. Posner had prescribed was completely full. Of the 120 tablets of Valium that Dr. Mazzella had prescribed for her a week earlier, 22 were left. None of the ten vials of injectable morphine that Dr. Mazzella had prescribed were found.

II. The Lawsuit
William Leslie Walker, as personal representative and the surviving spouse of Walker's estate, and Gregory Keith Strickland, Walker's surviving son, sued Dr. Posner and his professional association for damages resulting from Walker's overdose death. Plaintiffs claimed Walker's death was caused in part by Dr. Posner's failure to wean her from pain narcotics that she had been taking for chronic pain. Plaintiffs did not contend at trial that Dr. Posner provided Walker with the drugs that allegedly killed her, but asserted that in allowing Walker to become "addicted" to morphine, it was foreseeable that she would seek out and obtain the lethal doses of illegally prescribed narcotics from Dr. Mazzella.
At trial, plaintiffs provided standard of care and causation testimony through only one expert witness, Dr. Arthur Fournier, an internal medicine practitioner at the University of Miami School of Medicine. Dr. Fournier testified that Dr. Posner fell below his standard of care in his treatment of Walker by (a) failing to have an exit strategy so that she would not have to take pain medicines forever; (b) continuing to prescribe pain medicine; and (c) not referring Walker to people who could help her with her addictions. He testified that, within reasonable medical probability, Walker died of complications of her addiction, and that had her addiction been treated, she would have most likely survived. He also testified that, had Dr. Posner met the standard of care and weaned Walker using an alternative such as Dr. Rosomoff's program, it was more likely than not that Walker would not have been seeking medicines.
Although those were the only theories of negligence asserted by Dr. Fournier, at trial plaintiffs also introduced excerpts from Dr. Posner's deposition where he testified that he did not order a urinalysis on Walker to see if she was still on drugs when she told the pain team that she had been detoxified, and that in retrospect, he should have ordered one. No witness gave an expert opinion on Dr. Posner's failure to order a urinalysis.
After the court denied Dr. Posner's motion for a directed verdict, the jury found Dr. Posner 70% responsible for Walker's death, with the remaining fault attributed to Walker, and awarded plaintiffs total damages of $2,750,000. Dr. Posner filed a renewed motion for directed verdict, motion for judgment notwithstanding the verdict, or, alternatively, motion for new trial, contending in part that plaintiffs failed to establish that Dr. Posner's conduct fell below his standard of care; and that there was any causal link between Dr. Posner's alleged negligence and Walker's death. Alternatively, Dr. Posner contended that the verdict was against the manifest weight of the evidence and required a new trial. He also filed a motion for remittitur. The trial court did not overturn the jury's decision. Judgment was entered in the *665 amount of $1,925,000, and this appeal followed.

III. The Appeal
Dr. Posner contends that the jury's verdict was improper and cannot stand due to plaintiffs' failure to establish a causal link between their several theories of negligence and Walker's death. He further contends that the jury's verdict was contrary to the manifest weight of the evidence. Finally, he contends that plaintiffs' counsel's argument was improper. We agree with Dr. Posner that the verdict against him cannot stand due to the plaintiffs' failure to establish a causal link between their several theories of negligence and Walker's death.
In reviewing a trial court's denial of a motion for directed verdict, an appellate court must evaluate the evidence in the light most favorable to the non-moving party, and should grant the motion if there is "no evidence upon which the jury could legally base a verdict" in favor of the non-moving party. Floyd v. Video Barn, Inc., 538 So.2d 1322, 1325 (Fla. 1st DCA 1989). Dr. Posner is entitled to judgment as a matter of law because plaintiffs failed to establish that any alleged breach in his standard of care more likely than not caused or contributed to Walker's death. Gooding v. University Hosp. Bldg., Inc., 445 So.2d 1015 (Fla.1984).
Plaintiffs' alleged theories of negligence were that Dr. Posner fell below his standard of care in his treatment of Walker by (a) failing to have an exit strategy "so that the patient will not have to take pain medicines forever"; (b) continuing to prescribe pain medicine; (c) not referring Walker "to people who could assist her with her addiction"; (d) failing to order a urinalysis on Walker; (e) failing to elicit support from Walker's family; and (f) failing to contact the pharmacies that Walker may have been using to fill her prescriptions.

a. Exit Strategy
First, with respect to plaintiffs' exit strategy argument, although they asserted that Dr. Posner's alleged negligent failure to implement an "exit strategy" caused Walker's death, the undisputed evidence shows that an exit strategy was tried and failed. Thus, an exit strategy would not have "more likely than not" prevented Walker from seeking additional narcotics from Dr. Mazzella. Gooding, 445 So.2d at 1018 (stating that "Florida courts follow the more likely than not standard of causation.").
The Florida Supreme Court stated long ago that "[t]he opinion of an expert is not sufficient to eliminate the necessity of proving the foundation facts necessary to support the opinion." Harris v. Josephs of Greater Miami, Inc., 122 So.2d 561, 562 (Fla.1960). Here, the expert's testimony assumed that (1) Dr. Posner had no exit strategy; (2) had Dr. Posner had an exit strategy, it would have been successful; (3) had a successful exit strategy been implemented, Walker would not have obtained drugs elsewhere to cause her to overdose. None of these assumptions were proven.
Walker's severe, chronic pain was undisputed. Over the years, Dr. Posner treated Walker with anti-inflammatories, physical therapy, steroid injections, non-narcotic medications and surgery. None of these methods worked, and Walker's pain became so intolerable that she had to be hospitalized on many occasions. The evidence reflects that throughout his ten years of care and treatment of Walker, Dr. Posner continuously tried to determine the source of Walker's pain through testing and referrals to other physicians.
Dr. Posner indeed had an exit strategy: he repeatedly discharged Walker from his care when he believed she had reached *666 maximum medical improvement. But Walker would always return to him in unbearable pain. When Dr. Posner's pain team temporarily withdrew all of Walker's pain medication in an attempt to wean her from it, Walker suffered from intractable pain that continued to escalate after that point.
Dr. Posner arranged to have Walker treated by a psychologist to learn how to control her pain with the medications appropriately. The pain team again tried to treat Walker without narcotics, but again was unable to do so because of her pain. In fact, it was during the pain team's second attempt to reduce Walker's level of drugs that Walker began to obtain MS Contin from Dr. Mazzella.
There was no dispute at trial that Dr. Posner and the pain team unsuccessfully attempted to wean Walker from narcotics. Given the substantial, undisputed evidence of the impossibility of implementing a successful exit strategy, any alleged failure to have such a strategy did not cause or contribute to Walker's death. McKeithan v. HCA Health Servs. of Fla., Inc., 879 So.2d 47 (Fla. 4th DCA 2004)(finding that the plaintiffs presented no competent testimony as to causation); Ewing v. Sellinger, 758 So.2d 1196 (Fla. 4th DCA 2000); Paddock v. Chacko, 522 So.2d 410 (Fla. 5th DCA 1988).

B. Continuing to Prescribe Medications
With regard to plaintiffs' continuing to prescribe medication argument, it is similar to plaintiffs' lack of "an exit strategy" argument. Both arguments are based on Dr. Posner's continued provision of prescription pain narcotics. For the same reasons discussed regarding the lack of an exit strategy, the undisputed evidence shows that there can be no causal connection between Dr. Posner continuing to prescribe Walker medications and her death.
Dr. Posner's continuation of Walker's medication could not have provided an independent basis for a finding of liability because the evidence was undisputed that Dr. Posner's drug prescriptions themselves did not cause or contribute to Walker's death. The drugs that killed Walker were the ones provided by Dr. Mazzella. The record demonstrates that during opening statements at trial, Walker's counsel admitted that they would not be able to prove that Walker died from ingesting medicine prescribed by Dr. Posner.

C. Failure to Refer
Turning next to plaintiffs' allegation that Dr. Posner failed to refer Walker to a pain clinic such as the one run by Dr. Rosomoff at the University of Miami, this theory fails because Walker expressly rejected Dr. Posner's repeated attempts to send her to a pain clinic. The only way Dr. Posner could force Walker into the pain clinic would be through involuntary hospitalization. Dr. Fournier never testified that Walker met the criteria for such action. As a physician, Dr. Posner cannot make his patients do exactly as he tells them. He can only give advice and treatment alternatives, then let them make choices. Further, the undisputed evidence shows that Dr. Posner tried all of the methods that were being used at the pain clinic. None of them were successful with Walker. Dr. Posner testified that alternative treatment forms tried on Walker were physical therapy, injections, biofeedback, anti-inflammatory medications, as well as anti-seizure and anti-depressant drugs. None of these succeeded.
In addition, Dr. Posner sent Walker to Dr. Lebwohl at the University of Miami on more than one occasion to explore surgical treatments for her pain. Dr. Lebwohl tested Walker and reported that surgery was not an option. In sum, the record was void of any evidence indicating that the pain clinic could have offered additional *667 treatment methods that had already been tried unsuccessfully on Walker.
It was further undisputed at trial that Dr. Posner told Walker not to seek narcotics from any other sources and that Walker failed to heed his warnings. The record does not support a finding that Walker would have followed this advice had it been given by the University of Miami Pain Treatment Center instead of by Dr. Posner. As such, because the methods being used by the pain clinic had been tried on Walker and failed, because Walker rejected Dr. Posner recommendations that she attend a pain clinic, and because Walker was told by Dr. Posner not to seek narcotics from other sources, plaintiffs failed to establish legal causation under this theory of liability. Paddock, 522 So.2d at 413 (questioning how legal causation could exist for defendant's failure to hospitalize plaintiff where defendant recommended hospitalization and his recommendation was rejected).

D. Not Ordering a Urinalysis
Plaintiffs further contend that Dr. Posner was negligent in not ordering a urinalysis. There is no support for this theory of negligence. Here, there was no trial testimony that Dr. Posner's failure to perform a urinalysis in July 1993 fell below his standard of care. Dr. Fournier did not testify regarding Dr. Posner's failure to order a urinalysis. What Dr. Fournier did testify to was that Dr. Posner was entitled to take Walker's word that she had detoxified herself, but that he should have stopped prescribing the narcotics after that time. Because there was no testimony elicited that Dr. Posner's failure to order a urinalysis fell below his standard of care, this theory should not have been submitted to the jury. Moisan v. Frank K. Kriz, Jr., M.D., P.A., 531 So.2d 398, 399 (Fla. 2d DCA 1988); Marsh v. City of St. Petersburg, 106 So.2d 567 (Fla. 2d DCA 1958).
In addition, there was no causation testimony concerning Dr. Posner's alleged failure to order a urinalysis. He testified that even if he had ordered a urinalysis, "it may or may not have been helpful." Furthermore, a review of the record actually indicates that it probably would not have made a difference because the physicians on Dr. Posner's pain team put Walker back on narcotics after she stated she had detoxed herself because her intractable pain had returned. Thus, the failure to order a urinalysis does not support an independent basis for a finding of liability. Gooding v. University Hosp. Bldg., Inc., 445 So.2d at 1015 (Fla.1984).

E. Failure to Elicit Family Support or Contact Pharmacies
Finally, the plaintiffs' contention that Dr. Posner failed to get Walker's family's help or contact her pharmacies does not support finding Dr. Posner liable. Here, there was no testimony at trial that a physician's standard of care required Dr. Posner to find out from which pharmacies Walker was getting the drugs. Dr. Posner testified that this would be impossible due to the large number of pharmacies in South Florida and Walker could have gone to any of them.
Plaintiffs contend that Dr. Posner could have contacted Walker's family to find out where she was filling her prescriptions. However, there was no evidence regarding what Dr. Posner could have done had he contacted Walker's family. The record reveals no testimony regarding what Walker's family would have done or whether they would have assisted Dr. Posner in any way. Walker's husband testified that Walker, a nurse by training, was "very private" about her medical condition and "[p]rivate with the medication she was taking."
Moreover, Dr. Strauss, the only witness who suggested that not contacting a patient's *668 family could be a breach of a doctor's standard of care, testified that he did not have enough information to give an opinion on Dr. Posner's standard of care with regard to this issue. He further clarified on redirect that family involvement is not necessary if it appears that the patient understands the treatment. And even if Strauss' testimony was found competent on standard of care, this theory still should not have gone to the jury because no causal connection was established between Dr. Posner's failure to get help from Walker's family and Walker's death.

IV. Conclusion
Based on the foregoing reasons, Dr. Posner is entitled to judgment as a matter of law because the plaintiffs failed to establish legal causation in this case. Accordingly, the final judgment rendered in favor of the plaintiffs is reversed and the case is remanded for the entry of a judgment in favor of Dr. Posner and his professional association. Our disposition on this issue has rendered our consideration of the remaining two issues on appeal unnecessary.
Reversed and remanded.