# Third District Court of Appeal

## State of Florida

Opinion filed August 26, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D14-48 & 3D13-1923
Lower Tribunal No. 08-47844

_____

**Jose Luis Vargas, M.D., etc., et al.,**
Appellants,

vs.

**Monica A. Gutierrez, etc., et al.,**
Appellees.

Appeals from the Circuit Court for Miami-Dade County, Beatrice A. Butchko, Judge.

Hicks, Porter, Ebenfeld & Stein, P.A., and Dinah Stein and Mark Hicks; Ilisa W. Hoffman, for appellants.

Bambi G. Blum; Kurzban Kurzban Weinger Tetzeli & Pratt, and Marvin Kurzban and Jed Kurzban, for appellees.

Before SHEPHERD, ROTHENBERG and SCALES, JJ.

ROTHENBERG, J.

Jose Luis Vargas, M.D., and Jose Luis Vargas, M.D., P.A. (collectively, "Dr. Vargas") appeal the trial court's denial of their motion for a directed verdict and, in the alternative, for a new trial. We affirm the denial of Dr. Vargas's motion for a directed verdict but reverse and remand for a new trial based on the plaintiffs' violation of the "one expert per specialty" rule and for materially misrepresenting the evidence in closing arguments, both of which unfairly and materially prejudiced Dr. Vargas and denied him his right to a fair trial.

## FACTUAL BACKGROUND

Monica Gutierrez ("Monica") and her parents (collectively, "the plaintiffs") brought this action against Dr. Vargas for his alleged negligent failure to timely diagnose Monica's kidney disease, which ultimately led to renal failure, dialysis, and multiple kidney transplants. The jury entered a verdict in favor of the plaintiffs in the amount of $4,101,776.

The following facts are undisputed. Monica Gutierrez ("Monica") was born in August 2000, and Dr. Vargas was Monica's primary pediatrician for the first six years of her life. During that six-year period, Monica's parents brought Monica to Dr. Vargas for several routine checkups. During these checkups, Dr. Vargas took urine samples from Monica consistent with typical practice. The urinalyses from these samples revealed elevated levels of protein in Monica's urine—a potential indicator of kidney disease—in five separate tests over the first three years of

2

Monica's life. Dr. Vargas did not follow up on these test results, believing that each of the samples had been contaminated with bacteria because Monica was still in diapers. Record testimony established that it is quite common for infants to have bacterial contamination of their urine samples due to constant contact with bacteria in their diapers. Although Monica was small and underdeveloped for her age, she otherwise exhibited no symptoms of any illness and appeared healthy. After a sixth urine specimen showed no elevated protein levels, no further urine samples were collected or tested during the following three years when Monica was between the ages of three and six.

During September 2006, however, Monica began exhibiting abnormal symptoms, including periodic episodes of swelling around her eyes and in her legs, excessive drinking and urination, and abnormal weight gain of six pounds over a one-month period of time. Dr. Vargas was not notified of these symptoms, and no treatment was sought until October 2006 when Monica's condition worsened and her parents brought her to Miami Children's Hospital ("MCH"). At that point, Monica had an elevated temperature and swelling of her lower extremities, and she was suffering from renal (kidney) failure.

Monica was immediately examined by Dr. Paredes, a pediatric nephrologist, who took a kidney biopsy and sent the tissue sample to Dr. Victor Pardo, a pathologist at MCH, for examination and diagnosis. Dr. Pardo examined several

3

tissue slides from the kidney biopsy and noted elevated levels of C1q protein. Based on these findings, Dr. Pardo diagnosed Monica with "Diffuse Proliferative Immunecomplex Glomerulonephritis." Dr. Pardo finalized his conclusions in a written report that was sent to Dr. Paredes, but Dr. Pardo never saw or administered care to Monica or spoke directly to Dr. Paredes. Importantly, Dr. Paredes never made a formal diagnosis of the underlying disease that caused the kidney failure or offered any opinion regarding the onset or duration of Monica's kidney disease.

Due to the severity of the damage to Monica's kidneys, Dr. Paredes placed Monica on dialysis until a kidney donor could be located. Approximately seven months later, Monica underwent successful kidney transplant surgery, and her diseased kidneys were removed. Following the transplant, one of the removed kidneys was sent to a different pathologist at MCH, Dr. Philip Ruiz, for further examination. Dr. Ruiz noted in his report that the tissue on the kidney **was severely scarred to the point that he could not accurately diagnose what disease had caused the damage**, but he opined that the kidney had failed due to a chronic immune complex disease. Similar to Dr. Pardo, Dr. Ruiz did not ever see or administer care or treatment to Monica, did not communicate with Dr. Paredes, and did not offer an opinion as to the cause, identity, or duration of Monica's

4

kidney disease. While Monica's kidney transplant was successful, she will likely need dialysis and additional kidney transplants during her lifetime.

Monica and her parents brought a medical malpractice suit against Dr. Vargas in 2008, alleging that Dr. Vargas should have followed up on Monica's positive urine samples and that, if he had done so, Monica could have been treated for her disease and been able to avoid dialysis and kidney failure. The plaintiffs allege that Monica's kidney failure is the result of a disease called C1q nephropathy, which takes years to cause the type of damage to Monica's kidneys that she had at the time of her admittance to MCH and should have been discovered by Dr. Vargas before the disease caused end-stage renal failure.

C1q nephropathy is a very rare disease that causes C1q proteins to build up in the kidneys, which damages and scars the kidneys over time. C1q nephropathy is a recently discovered form of kidney disease that is often referred to as a "silent killer" because C1q patients can display no symptoms right up to the point of renal failure. Indeed, there are often no outward indications that anything is wrong with C1q patients until they have reached late-stage kidney disease with swelling, high blood pressure, high cholesterol, and occasionally fever. One of the only ways to accurately diagnose C1q nephropathy is to have the patient submit to a biopsy of her kidney and to have a pathologist examine the tissue to determine if there are elevated levels of C1q protein in the patient's kidney samples.

5

Conversely, Dr. Vargas contends the disease that destroyed Monica's kidneys was not the chronic, longstanding disease of C1q nephropathy, but rather a faster-moving disease called Rapidly Progressive Glomerulonephritis ("RPGN"). Dr. Vargas also contends that even if the underlying disease was in fact C1q nephropathy and Dr. Vargas had correctly diagnosed the illness, there was nothing that Dr. Vargas could have done to prevent Monica's renal failure and the resulting dialysis and kidney transplants. In other words, Dr. Vargas claims that the dialysis and kidney transplants were inevitable due to the nature of Monica's disease, and any action or inaction on his part did not cause Monica's injuries.

These issues were hotly disputed at trial, and both sides sought to introduce testimony from various medical experts regarding both the diagnosis and the treatment of the disease.[1] Thus, Dr. Vargas filed a motion in limine to prevent the plaintiffs from presenting cumulative expert testimony regarding the timing and diagnosis of the disease, specifically arguing that Drs. Pardo and Ruiz should not be permitted to render expert opinion testimony on that subject and should be confined to offering factual testimony as "treating physicians." Judge Platzer, who was presiding over the case at the time, granted Dr. Vargas's motion in part and

---

[1] Pathologists, who essentially function as diagnostic experts who examine tissues and laboratory tests to reach a diagnosis, are best equipped to testify regarding the diagnosis of Monica's disease, whereas nephrologists, who specialize in treating diseases of the kidneys, are best equipped to testify whether Monica's disease could have been treated at certain stages of the disease's progression and, if so, with what types of medication.

6

limited both sides to "one expert per specialty." **Judge Platzer's ruling also specifically prohibited the plaintiffs from using the treating physicians to elicit expert opinion testimony regarding the timing of the disease**. Judge Platzer retired before the case was resolved, and Judge Butchko was substituted in her place midway through the proceedings.

Despite Judge Platzer's ruling, the plaintiffs called **not one, but four separate pathologists** at trial to testify regarding the timing and diagnosis of the disease: (1) Dr. Pardo, who analyzed the biopsy when Monica was initially admitted to MCH; (2) Dr. Ruiz, who analyzed one of Monica's kidneys after they were removed during Monica's transplant surgery; (3) Dr. Cohen, who examined several tissue samples at the plaintiffs' behest and was the plaintiffs' designated expert pathologist; (4) and Dr. Croker, who the plaintiffs called as an expert rebuttal witness following Dr. Vargas's case-in-chief. All of these pathologists testified that, **in their medical opinion**, the disease was most likely chronic C1q nephropathy that had been developing over a four-to-six-year period. Importantly, Drs. Pardo and Ruiz had not made these findings or diagnosed C1q nephropathy during their initial examination of the kidneys. Conversely, Dr. Vargas was only permitted to call one pathologist: his designated expert, Dr. Craver, who testified that Monica's renal failure was caused by RPGN, which would have been present

7

for only four to six months rather than four to six years and would have been virtually undetectable prior to Monica's hospitalization.

Additionally, each side was permitted to call an expert pediatric nephrologist to testify regarding the respective courses C1q nephropathy and RPGN would take and what treatment options would have been available at various stages of the diseases. This testimony was critical to establish causation, i.e., that Dr. Vargas could have done something to prevent total kidney failure necessitating the dialysis and kidney transplant if he had correctly diagnosed Monica's disease or referred her to a nephrologist when he initially discovered the positive protein tests several years prior.

The plaintiffs' designated expert nephrologist, Dr. Bernard Kaplan, testified largely in generalities, stating that, "In all likelihood, [Monica's] outcome would have been much better than it was without any treatment." Dr. Kaplan reiterated similar statements about Monica's chances for recovery several times. When finally asked to quantify how different the result would have been had C1q been diagnosed earlier, Dr. Kaplan refused to specifically state that Monica would have recovered in full or that she would not have needed to go on dialysis or have kidney transplant surgery had her disease been diagnosed earlier. Instead, he testified that: "Patients [in general] with C1q nephropathy who have been diagnosed on the basis of proteinuria alone without any other abnormalities have

8

almost universally gone on to do well and remain in remission and not require dialysis or transplant." Then, when asked whether "the fact that she stayed asymptomatic for such a long period of time indicate[d] that there was a large window of opportunity to salvage [Monica's kidneys]," Dr. Kaplan replied: "I think I've implied that in my previous answers. Yes." Dr. Kaplan did not, however, state what sort of treatment, if any, was available for C1q nephropathy or whether these treatments would have been available in Monica's particular case.

Dr. Vargas's designated expert nephrologist, Dr. Christopher Clardy, also testified regarding the treatment of RPGN and C1q nephropathy. Dr. Clardy stated that Monica's kidney failure could only have been a result of RPGN due to the progression of the disease. Dr. Clardy stated that there was no known treatment for the types of C1q nephropathy that could have caused Monica's renal failure, so even assuming Monica had C1q nephropathy and Dr. Vargas had made that diagnosis after the first urine test, Monica still would have required dialysis and a kidney transplant. Specifically, Dr. Clardy testified:

> [I]t would not have made a difference [if Dr. Vargas had known Monica had C1q nephropathy after the first positive urine test]. . . . There's no known treatment for either of those two [types of C1q nephropathy]. People have attempted to treat it. Some people do better. Some patients do better than others, but there's no acknowledged therapy for either of those [types of C1q nephropathy]. So even if you had known back in, you know, 2001 or you know some time after that, there would have been nothing that you would have done differently that would have caused any different outcome.
> . . . .

9

If she had had C1q nephropathy, which is one of the two types that can cause chronic kidney insufficiency, yes. She would have probably still needed dialysis unfortunately and a transplant.

Dr. Clardy also testified that if Monica had RPGN instead of C1q nephropathy, there is no way that Dr. Vargas could have discovered the disease in time to save Monica's kidneys.

In closing argument, plaintiffs' counsel told the jury that Monica clearly had C1q nephropathy, not RPGN, **because so many doctors—including her treating physicians—had opined that C1q had caused the kidney failure**. The plaintiffs' counsel also argued that Dr. Kaplan had stated that Monica could have been completely cured with the use of some steroids and ACE inhibitors had she been diagnosed earlier. This testimony, however, was completely fabricated by the plaintiffs' counsel, as Dr. Kaplan provided no such testimony. Although Dr. Vargas timely objected, the trial court failed to rule on his objection and merely instructed the jury to rely on its recollection of the testimony. The jury ultimately found in Monica's favor, awarding over $4 million in damages. This appeal followed.

## LEGAL ANALYSIS

### I. The denial of Dr. Vargas's motion for a directed verdict

This Court reviews a trial court's ruling on a motion for a directed verdict de novo, but it must view the evidence in the light most favorable to the nonmoving

10

party.  Tricam Indus. v. Coba, 100 So. 3d 105, 108 (Fla. 3d DCA 2012).  Thus, we may reverse only if there is no evidence upon which the jury could legally base a verdict in favor of the nonmoving party.  Posner v. Walker, 930 So. 2d 659, 665 (Fla. 3d DCA 2006).

Although the evidence presented by the plaintiffs as to causation was extremely weak, because the plaintiffs presented some evidence that treatment could have either halted or slowed the disease had Monica's kidney disease been diagnosed earlier, we affirm the trial court's denial of Dr. Vargas's motion for a directed verdict.  See Friederich v. Fetterman & Assocs., 137 So. 3d 362, 365 (Fla. 2013) (reiterating that where there is conflicting evidence as to causation, the appellate court may not reweigh the evidence or substitute its judgment for that of the trier of fact).

## II.     The denial of Dr. Vargas's motion for a new trial

We review the trial court's denial of Dr. Vargas's motion for a new trial for an abuse of discretion.  See Miami-Dade Cnty. v. Asad, 78 So. 3d 660, 664 (Fla. 3d DCA 2012).  We hold that the trial court erred by denying Dr. Vargas's motion for a new trial because the plaintiffs were able to call four expert pathologists over Dr. Vargas's objections, and each pathologist was permitted to give his opinion on the nature and duration of Monica's illness, which unfairly prejudiced Dr. Vargas, who was limited to only one pathology expert on that subject.  Additionally, the

11

trial court should have sustained Dr. Vargas's objections and given a curative instruction when the plaintiffs' counsel misstated crucial pieces of evidence regarding causation and bolstered the plaintiffs' experts' testimony during closing arguments. These errors deprived Dr. Vargas of a fair trial, and thus, a new trial is required. See Hurst v. State, 18 So. 3d 975, 1015 (Fla. 2009) ("Where multiple errors are found, even if deemed harmless individually, 'the cumulative effect of such errors' may 'deny to defendant the fair and impartial trial that is the inalienable right of all litigants.'" (quoting Brooks v. State, 918 So. 2d 181, 202 (Fla. 2005))).[2]

### A. The trial court erroneously allowed the plaintiffs to present cumulative expert testimony in contravention of its pre-trial "one expert per specialty" rule.

A new trial is required in this case in large part because the trial court erred by allowing the plaintiffs to call four experts with the same medical specialty, pathology, to testify regarding the timing and nature of the disease that caused Monica's injuries. Which precise disease caused Monica's symptoms—RPGN or C1q nephropathy—was the primary dispute at trial. Both illnesses can cause symptoms like those displayed by Monica, and both illnesses often end in complete

_____

[2] Hurst is, of course, a criminal case, but its reasoning regarding cumulative error is sound when applied in civil cases as well. See Kiwanis Club of Little Havana, Inc. v. de Kalafe, 723 So. 2d 838, 840-41 (Fla. 3d DCA 1998) (finding that the "cumulative effect" of several improper rulings deprived the civil defendant of a fair jury trial).

renal failure requiring dialysis and kidney transplants. Accordingly, both the plaintiffs and Dr. Vargas relied on expert testimony to establish which disease caused Monica's injuries. The trial court unfairly limited Dr. Vargas to one expert on this topic while allowing the plaintiffs to call four. In a case such as this that often devolves into a battle of the experts, the plaintiffs' ability to call four experts with the same medical specialty to support their position may well have unfairly swayed the jury to decide the case in the plaintiffs' favor.

The trial court's pre-trial order below expressly limited each side to one expert witness per specialty area. The so-called "one expert rule" limiting the presentation of cumulative expert testimony is common in pre-trial orders, particularly in medical malpractice cases, because cases disputing the standard of care or damages incurred often come down to a "battle of the experts." See Olesky ex rel. Estate of Olesky v. Stapleton, 123 So. 3d 592, 594 (Fla. 2d DCA 2013) ("The trial, like many medical malpractice cases, became a 'battle of the experts.'"). The rationale supporting the one expert rule is that by limiting each party to one expert per specialty, the case will not be decided by which side has the assets to afford more expert witnesses to sway the jury, but rather, it will be decided on the credibility of the single best expert each side can present on the issue. The authority for the one expert rule derives from the trial court's inherent authority to control the trial proceedings and presentation of evidence. Gold, Vann

13

& White, P.A. v. DeBerry ex rel. DeBerry, 639 So. 2d 47, 56 (Fla. 4th DCA 1994); see also Carpenter v. Alonso, 587 So. 2d 572, 573 (Fla. 3d DCA 1991); Maler ex rel. Maler v. Geraldi, 502 So. 2d 973, 974 (Fla. 3d DCA 1987).

We typically review a trial court's ruling on evidentiary matters, including the admissibility and presentation of cumulative evidence and the exclusion of witnesses, for an abuse of discretion. Stager v. Fla. E. Coast Ry. Co., 163 So. 2d 15, 17 (Fla. 3d DCA 1964). However, where the trial court's pre-trial order expressly limits each party to one expert per specialty area, as here, the trial court abuses its discretion by allowing one party to disobey that order by presenting multiple experts on a hotly contested issue because it works substantial prejudice to the opposing party. Again, the whole point of such rules is to facilitate a fair "battle of the experts." The trial court should not limit one party's presentation of expert witnesses while allowing the other party to present overwhelming and cumulative evidence through multiple expert witnesses. Because the expert testimony in medical malpractice cases is so important, a trial court's mismanagement of expert testimony can be dispositive.

Policing the one expert rule would be relatively simple if every testifying medical professional was an expert medical witness, but that is simply not the case. Medical professionals testifying solely as treating physicians, although they are licensed medical doctors and could potentially be expert witnesses if they are

14

properly qualified and designated as such, are beyond the ambit of the one expert rule because they are more akin to fact witnesses with relevant evidence to convey not because they are medical experts, but because they observed the patient through normal sensory processes like any other "run-of-the-mill eye, ear, or other witness to the events . . . of the pending litigation." Frantz v. Golebiewski, 407 So. 2d 283, 285 (Fla. 3d DCA 1981); see also Carpenter, 587 So. 2d at 573. However, whether a particular witness is a "treating physician" or an "expert witness" is not always easily determined.

There are two discrete methods of analyzing whether a particular testifying medical professional is an expert witness subject to the one expert rule or a mere fact witness as a treating physician. The first method, the so-called "status-based" approach, is to examine whether the expert was retained "'in anticipation of litigation or for trial,' as in the case of an expert retained by counsel." Frantz, 407 So. 2d at 285 (quoting Zuberbuhler v. Div of Admin., State Dep't of Transp., 344 So. 2d 1304, 1306 (Fla. 2d DCA 1977), cert. denied, 358 So. 2d 135 (Fla. 1978)). Under this approach, the court looks to the **reason** the medical professional was retained to determine whether that professional is an expert or a fact witness. If the physician was retained for purposes of litigation after the treatment was completed, then the physician is an expert witness; but if the physician was retained to render treatment or care directly to the patient, then the physician is a fact witness as a

15

treating physician. Id.; see also Drew v. Lee, 250 P.3d 48, 54 (Utah 2011) (discussing the different approaches for determining whether a physician is an expert). This type of analysis focuses on the status of the physician.

Alternatively, the "substance-based" approach looks to the **content** of a particular witness's testimony to determine whether that witness is testifying as a medical expert witness or a treating physician fact witness. Drew, 250 P.3d at 53-54. Under this approach, a witness that opines on expert-type subject matter will be classified as an expert witness even if he or she rendered medical services to treat the patient, which would typically make the witness a treating physician under the status-based approach. A corollary to this classification is that only those treating physicians who limit their testimony to the facts of the treatment are properly labeled treating physician fact witnesses. See Fittipaldi USA, Inc. v. Castroneves, 905 So. 2d 182, 186 n.1 (Fla. 3d DCA 2005) ("It is entirely possible that even a treating physician's testimony could cross the line into expert testimony."). For example, under this approach, a physician who rendered care to a patient could clearly testify as to the dates of treatment, the symptoms with which the patient presented, and the course of treatment administered without being labeled an expert witness. But if that same physician testifies regarding the standard of care in the industry when it comes to treating that ailment, that

16

testimony is improper expert testimony unless that treating physician was also listed and admitted as an expert.

Florida cases have recognized both the status-based and substance-based approaches, and both approaches are useful. Medical professionals retained in anticipation of litigation or after the patient's treatment was complete will **nearly always** be classified as expert witnesses subject to the one expert rule because they have no facts about which they could testify. However, physicians that provide treatment to a patient outside of the litigation context may still be considered experts for purposes of the rule if they give expert opinion testimony. Tetrault v. Fairchild, 799 So. 2d 226, 227-28 (Fla. 5th DCA 2001) (reversing when a "fact witness" radiologist gave his opinion at trial about MRIs he had not seen before); Pete v. Youngblood, 141 P.3d 629, 634 (Utah Ct. App. 2006) ("To the extent a treating physician simply provides a factual description of his or her personal observations during treatment, the testimony is not opinion evidence and no identification of the treating physician as an expert is required. . . . If, however, the treating physician also offers an opinion as to the standard of care or whether that standard has been breached, the testimony is no longer simply factual."); see also Fittipaldi, 905 So. 2d at 185-86 (holding that an attorney testifying as a fact witness had "crossed the line into expert testimony" by giving his opinion on the legal quality of a contract); Ryder Truck Rental, Inc. v. Perez, 715 So. 2d 289, 291

17

(Fla. 3d DCA 1998) (Jorgenson, J., dissenting) (reasoning that a physician who provided treatment had also provided expert testimony by opining whether a patient had reached maximum medical improvement). A well-known parable warns readers to be watchful for wolves in sheep's clothing; trial courts should likewise be wary of litigants attempting to elicit expert testimony disguised as fact testimony from a treating physician.

Here, the plaintiffs elicited expert testimony from the two "treating" pathologists (Drs. Pardo and Ruiz) and also called an expert pathologist in rebuttal (Dr. Croker) in addition to their one designated expert pathologist (Dr. Cohen). Allowing such an unfair balance of expert testimony violated both the letter and spirit of the one expert rule because it permitted the plaintiffs to proffer four different experts with the same medical specialty to vouch for their theory of the case, while Dr. Vargas was prevented from calling any additional experts.

Dr. Pardo is the pathologist who initially examined Monica's kidney biopsy upon her admittance to MCH, while Dr. Ruiz is the pathologist who examined one of Monica's kidneys after they were both removed during her transplant surgery. Drs. Pardo and Ruiz noted their findings in written reports but never saw or communicated with Monica or otherwise communicate with Dr. Paredes. Importantly, neither Dr. Pardo nor Dr. Ruiz identified the cause, specific type, or duration of Monica's kidney disease or recommended treatment. In fact, Dr. Pardo

18

diagnosed Monica in his written report with "Diffuse Proliferative Immunecomplex Glomerulonephritis," which indicates a type of kidney injury that could be consistent with either RPGN or C1q nephropathy. Similarly, Dr. Ruiz noted severe scarring and damage to the glomeruli of the kidney but also stated that he could not determine the precise cause of the injury.

When called by the plaintiffs at trial, both Drs. Pardo and Ruiz explained how they had examined the tissue samples and what their findings were. There was no error in this portion of the testimony. However, both Drs. Pardo and Ruiz **also testified** that they believed **in their medical opinion** that Monica's kidney damage was chronic, had been present for several years, and likely indicated she had the slow-moving C1q nephropathy, not the rapidly-progressing RPGN. Neither doctor had made these findings upon their initial examination of the tissue samples, nor had either doctor ever made a finding that Monica's injuries were caused by C1q nephropathy during Monica's treatment at MCH. In fact, the first time the doctors had rendered these opinions was during their testimony at trial.

Such testimony crossed the boundary from that of a treating physician to that of an expert witness. In fact, the testimony elicited from Drs. Pardo and Ruiz closely mirrors that of the plaintiffs' actual designated expert, Dr. Cohen, and Dr. Cohen relied on the same slides and tissue samples that Drs. Pardo and Ruiz relied on to reach their conclusions. Moreover, Drs. Pardo and Ruiz did not actually

19

"treat" Monica, diagnose the cause of her kidney disease, or recommend a course of treatment. Dr. Ruiz examined Monica's kidney only **after** Dr. Paredes had already determined that Monica's kidneys could not be saved and after Monica's kidneys were removed. Thus, Dr. Ruiz did not play any role in Monica's diagnosis and treatment, and crucially, neither Dr. Pardo's nor Dr. Ruiz's report contain a concrete diagnosis or a recommended treatment. The doctors did not simply testify about the facts of their previous tissue examinations or the findings in their reports, they gave opinion testimony regarding the nature of the disease and the timing of the disease's progression that went beyond their treatment and reports. Such testimony can only be classified as cumulative expert opinion testimony, and the trial court erred by allowing these opinions.

Apparently unsatisfied that they were able to bolster their expert pathologist's testimony by proffering expert testimony on the timing of the disease from these two pathologists, the plaintiffs also called an additional expert pathologist, Dr. Croker, to testify as a rebuttal expert witness. Dr. Cohen, the plaintiffs' primary expert pathologist, testified on direct examination regarding the slides he had examined and the reasons he believed the disease was the slower-moving C1q nephropathy as opposed to the rapidly progressing RPGN. After the plaintiffs rested, Dr. Vargas called several witnesses, including his expert pathologist, Dr. Craver. Dr. Craver examined the same slides that Dr. Cohen had

20

examined and reached the exact opposite conclusion: that Monica's disease was RPGN that had manifested itself over a period of only four to six months. In rebuttal, rather than recalling Dr. Cohen to address portions of Dr. Craver's testimony he had not addressed, the plaintiffs called a **fourth** expert pathologist witness, Dr. Croker, to testify about three of the slides Dr. Craver had examined.

This rebuttal testimony was largely unnecessary, totally cumulative, and served only to bolster the testimony of the plaintiffs' three prior expert pathologists, as Dr. Cohen had already given his opinion about the nature and timing of the disease. Moreover, Judge Platzer had previously ruled that the plaintiffs would not be allowed to call a separate rebuttal witness in accordance with the one expert rule. Nonetheless, the plaintiffs called Dr. Croker to further add to their already-substantial advantage in expert testimony. Simply put, the plaintiffs attempted to leave no doubt that the jury would rule in their favor by disregarding the one expert rule and reinforcing their experts' opinions until no other result seemed reasonable.

Unfair cumulative expert testimony is prejudicial in most cases and will rarely be considered harmless error, Tetrault, 799 So. 2d at 228, and we believe this to be particularly true when the opposing party is strictly limited to one expert. The unfair use of expert testimony in this case requires a new trial. Dr. Vargas

may or may not ultimately be responsible for Monica's injuries, but he is certainly entitled to the fair trial of which he was deprived.

### B. The plaintiffs' improper closing arguments unfairly prejudiced Dr. Vargas.

The plaintiffs exacerbated these errors by misstating the presented evidence during their closing arguments and bolstering the expert opinion testimony provided by Drs. Pardo and Ruiz. The improper closing arguments in this case were particularly prejudicial, and, when combined with the cumulative expert testimony, they warrant a new trial.

As stated by the Florida Supreme Court:

> The purpose of closing argument is to help the jury understand the issues in a case by applying the evidence to the law applicable to the case. Attorneys should be afforded great latitude in presenting closing argument, **but they must confine their argument to the facts and evidence presented to the jury** and all logical deductions from the facts and evidence. Moreover, closing argument must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response rather than the logical analysis of the evidence in light of the applicable law.

Murphy v. Int'l Robotic Sys., Inc., 766 So. 2d 1010, 1028 (Fla. 2000) (citations, quotation marks, and alterations omitted). These requirements ensure that a jury relies only on the facts presented in evidence and not on the expert rhetoric of a seasoned trial attorney.

In this case, perhaps recognizing the weakness of their evidence as to causation, the plaintiffs' counsel **misrepresented to the jury** that Dr. Kaplan had

22

testified that Monica could have been completely cured using only steroids and ACE inhibitors[3] had she been diagnosed with C1q nephropathy when the first positive protein tests came back. However, Dr. Kaplan did not offer any such testimony. In fact, he did not state that Monica could have been cured at all, much less explain how she could have been cured. This argument by plaintiffs' counsel materially altered the facts in evidence and materially prejudiced the jury. Rather than correcting the error, the trial court failed to sustain Dr. Vargas's timely objection and instead merely told the jurors to rely on their own recollection of the evidence presented at trial, which had lasted several weeks.

The plaintiffs' counsel also specifically asked the jury to rely on the testimony of Drs. Pardo and Ruiz, from whom the plaintiffs had elicited improper expert testimony, because they were not experts and had "no axe to grind." Thus, the plaintiffs were permitted to capitalize on the improperly admitted expert testimony by arguing that it was unbiased testimony of treating physicians, and as such, more reliable than the testimony of Dr. Vargas's competing expert.

These arguments mischaracterized the evidence, were highly improper, and materially prejudiced Dr. Vargas.

## CONCLUSION

---

[3] These are generally considered relatively minor and minimally invasive treatments in the medical community.

23

The plaintiffs in this case resorted to unfair tactics to secure a jury verdict in their favor. They violated the one expert per specialty rule by offering, over Dr. Vargas's objection, the testimony of four pathologists regarding the type of disease that had caused Monica's injuries. Then, in closing argument, they misrepresented the evidence by telling the jurors that they had heard conclusive evidence of causation when no such evidence had been presented. The combination of these errors gave the jury the impression that several doctors believed the disease that caused Monica's renal failure was C1q nephropathy and that C1q nephropathy could have been easily treated. These errors clearly deprived Dr. Vargas of a fair trial. Accordingly, we conclude that the trial court erred by denying Dr. Vargas's motion for a new trial.

Reversed and remanded.